C. J. BRIDGEN, Jr., et al., Plaintiffs,

v.

J. Edward SCOTT, Defendant.

Civ. A. No. 75–H–1881.

United States District Court,
S. D. Texas,
Houston Division.

Sept. 13, 1978.

James A. Carmody, Houston, Tex., for plaintiffs.

Frank E. Caton, Houston, Tex., for defendant.

## MEMORANDUM OPINION RELATING TO GRANTING OF DEFENDANT'S MOTION FOR INSTRUCTED VERDICT

COWAN, District Judge.

Trial of the above-styled case commenced before a jury, and thereafter the plaintiffs introduced, under the adverse witness rule, the testimony of the defendant, J. Edward Scott. Each of the plaintiffs testified, i. e., C. J. Bridgen, Jr., W. C. Franklin, John L. Hermon, John T. Isberg, Frank J. Kearny, Kathleen B. Lynch, Robert Lynch, and John Idonas. Plaintiffs also introduced a portion of the deposition testimony of McDonald Lynch, father of Kathleen B. and Robert Lynch, and the person who acted as their agent in connection with the transactions here in issue.

The parties, in connection with the plaintiffs' case, also introduced in evidence the following exhibits:

*—Plaintiffs' Exhibit 1*

An option contract dated July 19, 1973, between J. Edward Scott and Dr. and Mrs. Sylvester Thorn. (Under the terms of this option agreement, Dr. and Mrs. Thorn agreed to convey to Scott a 45-acre, strategically located, tract of land, in western Harris County, Texas, for $4,000,000.)

*—Plaintiffs' Exhibit 2*

The prospectus in a venture which would, had it materialized, have been designated as "Edward Scott Management/M.K.—73, Ltd." (This venture proposed a public offering by which Mr. Scott attempted to finance the purchase of the Thorn property.)

*—Plaintiffs' Exhibit 4*

"Confidential Memorandum Participation Interests in Edward Scott Management/E.M.K.—45, Ltd." (This is a detailed document, the pages of which have been numbered by counsel for the purpose of interrogation of witnesses, in which a detailed plan directed toward the financing of the purchase through a private offering was described in intricate detail.)

*—Plaintiffs' Exhibit 3*

A list of purchasers of participation interests in E.M.K.—45, as of December 31, 1973. (This list of purchasers in the partnership described in the "Confidential Memorandum" revealed that the plaintiffs herein, as of December 31, 1973, were the owners of 30.0% of the enterprise, and that four investors who were not plaintiffs herein were the owners of 12.5% of the enterprise. This list, which assumes considerable significance in the Court's decision, also reveals that J. Edward Scott, as General Partner, owned .96% of the participation interests, and as Limited Partner, owned 56.5% of the enterprise as of December 31, 1973.)

*—Plaintiffs' Exhibit 5*

A letter of transmittal from J. Edward Scott to all owners of participation interests, dated March 6, 1974. (This letter transmitted to the owners of the participation interests the list which is identified in the record as Plaintiffs' Exhibit 3.)

*—Plaintiffs' Exhibit 6*

Letter of non-distributive and investment intent, executed by each of the investors after March 6, 1974. (In this letter of non-distributive and investment intent, a form of which had originally been contained in the "Confidential Memorandum" (Plaintiffs' Exhibit 4), each of the investors, including the plaintiffs herein, represented among other things that he ". . . either (i) had experience in business enterprises or investments entailing a high degree of risk or of a similar nature to the risk involved in this investment, or (ii) had obtained independent financial advice with respect to any investment in the limited partnership.")

Each investor at the time he executed this letter of non-distributive intent in March of 1974, also, in connection with such execution, represented that:

I understand the nature of the investment being made by me and the financial risks thereof. I acknowledge that the investment offering contains sufficient information on the nature of my investment and I do not desire any further information or data concerning the limited partnership.

*—Plaintiffs' Exhibit 7*

A letter, dated December 17, 1974, from Scott. In this letter Scott, advised the holders of the participation interests that in his opinion general economic conditions during 1975 would not improve materially and that since he had not found a purchaser during 1974, there was little reason to predict that he would be more successful in 1975 and therefore advised that the partnership should not invest additional funds in the property at that time.

During the presentation of the plaintiffs' case, the defendant introduced in evidence two exhibits, to wit:

*—Defendant's Exhibit 1*

A document revealing the various purchasers who executed (on various dates between December 19 and December 29, 1973) the subscription application which is the last document contained in Plaintiffs' Exhibit 4 (Confidential Memorandum).

*—Defendant's Exhibit 2*

A letter from Mr. Scott dated December 26, 1974, summarizing a meeting on that date in which the holders of all participation interests, except for Isberg, Kearny and Kathleen B. Lnych, who were not present at the meeting, agreed to forward their pro rata share of $188,200 to the General Partner to be placed in an escrow account for the payment of taxes and interest for the year 1974 in the event the General Partner was able to establish a development corporation with Heritage Trust, or some other person or institution for the purpose of developing the land.

*Undisputed Facts from Evidence at Trial*

From the evidence adduced at trial a number of undisputed facts emerge.

The plaintiffs, with the exception of the two Lynch plaintiffs, are experienced executives with large corporations and are, as they represented themselves to be, sophisticated investors with considerable business experience. The two Lynch plaintiffs were represented in the matters in controversy by their father, McDonald Lynch, an experienced and substantial investor who acted as agent and trustee for the two younger Lynches.

In mid-1973, Dr. and Mrs. Sylvester W. Thorn decided to sell a 45.53-acre tract located strategically in Harris County, bordering two major thoroughfares. Dr. and Mrs. Thorn entered an option contract with the defendant here, J. Edward Scott. (See Plaintiffs' Exhibit 1). The option contract gave Scott a relatively brief period of time in which to make arrangements to exercise his option. It created an option period of 120 days. At the end of 120 days Scott could extend the option contract for an additional 30 days by paying an additional $40,000. Essentially, therefore, Mr. Scott had four months to put a group together to purchase the property; or he could put up $40,000 and extend that period of time to five months.

A large portion of this critical four-month period of time was lost in an abortive public offering. Terms of the public offering are set forth in Plaintiffs' Exhibit 2. Mr. Scott has testified that the public offering failed because it was so structured as to afford no substantial tax advantages, and a review of Plaintiffs' Exhibit 2 confirms his analysis of the absence of tax advantages. A finder of fact could legitimately conclude that the public offering failed because of lack of interest in the property or because the purchase price set forth therein, i. e., $4,000,000 for the 45 acres was excessive. On the other hand, any intelligent observer, or interested investor, would perceive immediately that at the time Dr. Thorn granted his option, it was obvious there was no line of willing purchasers standing at his door seeking to buy the property for $4,000,000. Dr. Thorn would hardly have given a five-month option contract if there had been a purchaser immediately available to buy the property.

In any event, as part of their case, plaintiffs did not prove or introduce any evidence that the public offering failed because of an excessively high price, or because of any lack of interest in the property. The defendant's testimony, although the testimony of an interested witness, is clear, convincing and uncontradicted that the public offering failed because of the absence of tax incentives in the public offering as structured.

On October 15, 1973, Mr. Scott determined that the public offering was a failure, aborted it, and thereafter determined to make a private offering.

The record established at the trial of this case is somewhat indefinite concerning the circumstances and events which intervened between the time the public offering was aborted and the completion of Plaintiffs' Exhibit 4, dated November 19, 1973, which is the "Confidential Memorandum" outlining in detail the terms and provisions of the private offering. Depositions and answers to interrogatories, which this Court has reviewed (and will discuss below) do set forth all of the facts and circumstances relating to this period.

The record at trial does reveal, however, that between the date upon which the public offering was aborted and November 19, 1973, the defendant, Mr. Scott, had conversations with McDonald Lynch, the father of Kathleen B. and Robert Lynch. McDonald Lynch directed the defendant to McDonald Lynch's lawyer, Robert L. Sonfield, whose opinion dated November 19, 1973, appears on page 65 of Plaintiffs' Exhibit 4.

Comparison of Plaintiffs' Exhibit 2 and Plaintiffs' Exhibit 4 indicate very material differences between the public offering, described in detail in Plaintiffs' Exhibit 2, and the private offering, described in Plaintiffs' Exhibit 4. Some of the significant differences between the public offering and the private offering are:

1. While the public offering had virtually no tax benefits, the tax benefits provided by the private offering were dramatic. It is apparent from pages 54 and 55 of Plaintiffs' Exhibit 4 and from the testimony of the plaintiffs themselves, that an investor in the private offering (Edward Scott Management/E.M.K.—45, Ltd.) received dramatic tax advantages. For every $1 invested in December of 1973, the investor was entitled to $2 of tax deductions for the year 1973.

   The Court can therefore take judicial notice that a taxpayer with $25,000 of income in the 50% tax bracket who purchased one $12,500 unit of participation would immediately recoup his investment in that his January 15, 1974 tax payable would be reduced by the amount of his investment. An investor with a substantial number of dollars in the 60% or 70% bracket would not only get his money back by January 15, but would actually realize a profit by January 15, 1974, the time when he filed his last payment of estimated taxes for the year 1973.

2. A new party had appeared in the transaction, i. e., React Corporation. It is established in the evidence at trial that React Corporation was owned by a company which was, in turn, owned by McDonald Lynch, the father of the two Lynch plaintiffs herein.

3. Under the public offering Dr. Thorn was to be paid a cash down payment of $400,000 and given a note in the amount of $3,600,000. To the contrary, under the private offering, React Corporation would receive a note for $4,640,000 and would be paid a total of $250,000 prepaid interest. Examination of the option contract reveals that the option contract gave the purchaser of the property from Dr. Thorn the right to make either a down-payment of principal at the time of the purchase of the property, or to pay $400,000 in prepaid interest.

4. Under the public offering, Mr. Scott was entitled to receive a 6% real estate commission; however, under the private offering, Mr. Scott was to receive, in 1973, a one-time management fee in the amount of $245,000.

5. Since the amount being paid to Dr. Thorn at the time of closing was to be designated as prepaid interest rather than as a payment of principal, and since Mr. Scott's compensation was to be in the form of a one-time management fee paid in 1973 for his services during the entire term of the partnership, and since the partnership was actually borrowing from an affiliate of React Corporation the amount of $240,000 more than the purchase price, investors were able to receive the very dramatic tax advantage illustrated above.

Each of the plaintiffs was given a copy of the "Confidential Memorandum" and each, with the exception of the two Lynch plaintiffs (who were represented by their father) talked briefly to Mr. Scott. Mr. Scott testified that he made no representations to any of the plaintiffs other than those contained in the "Confidential Memorandum." The plaintiffs' testimony differs slightly from that of Mr. Scott. They essentially testified that Scott advised them that the General Partner (Scott) would not be a Limited Partner. This statement, under the evidence and under the terms of Plaintiffs' Exhibit 4, is and was literally true because there was only one Limited Partner, and the investors in the project were both legally and practically described as purchasers of participation interests.

Some of the plaintiffs also testified that Mr. Scott did not advise them that this was a long-term investment, but on the contrary, advised that this was a short-term investment, and that a second payment, i. e., the payment which would be necessary in December 1974 to pay interest and taxes on the property, would never be made because there was a strong likelihood that the property would be sold after the six-month holding period, and before the 1974 payments were due.

All of the plaintiffs testified that they were fully aware that the investment in question contained large elements of risk, that it was a speculative investment, and that their motivation was to obtain tax benefits and hopefully a profit on the sale of the property.

All of the plaintiffs testified that they fully understood that under the terms and provisions of the "Confidential Memorandum" they would have no authority to participate in the management of the partnership, and the management of the partnership would rest entirely and solely in the hands of Edward Scott.

A close study of Plaintiffs' Exhibit 4 reveals the following additional pertinent facts which are established as a matter of law:

1. The property in question contains exactly 1,957,020 square feet of land. The transaction contemplated by E.M.K.–45 contemplated the payment of $4,640,000 for the property, giving a unit price of $2.37 per square foot.

2. Other specific pieces of property arguably comparable, and whose location was identified specifically on page 17 of Plaintiffs' Exhibit 4, had sold in mid-1973 or earlier at prices ranging from $2.25 a square foot to $6.25 a square foot. (See page 16 of Plaintiffs' Exhibit 4).

3. For the partnership to break even on the sale of the property by November 1974, it would be necessary to sell the property for $2.72 a square foot. "Break-even price" per square foot increased to $2.96 in November 1975, $3.20 in November 1977, $3.64 in November of 1978, and thereafter escalated rapidly to the point that the break-even sales price in November of 1993 would be $5.76 per square foot.

4. The estimated tax deduction for the participants on an annual cash investment of $250,000 in 1973 was $500,000, but this tax deduction dropped to $173,860 in November of 1974.

5. The participants would be required to invest $173,860 in November of 1974 in order to maintain the investment. This investment increased dramatically in November of 1975, at which time it would have been necessary for the participants to invest a total of $476,935 to maintain their investment.

From the foregoing it is apparent, and the Court holds as a matter of law, that any intelligent and experienced investor who carefully reviewed Plaintiffs' Exhibit 4 would be able to determine, simply from page 55 of Plaintiffs' Exhibit 4 alone, that there was a substantial chance that unless this property was sold before November of 1975, the partnership would not continue, and the various participants would "walk away" from the investment.

6. It is totally apparent from Plaintiffs' Exhibit 4 that the investment was structured so that the General Partner, all of the

purchasers of participation interests, or any single purchaser of a participation interest, could at any time "walk away" from the investment, losing absolutely nothing but the money which he had already invested, but benefiting to the extent of the tax advantages which he received almost immediately upon the making of his investment in December of 1973. All the loans in question were non-liability loans. No purchaser of a participation interest contractually obligated himself to continue to make contributions; on the contrary, the purchaser of a participation interest merely agreed that if he failed to make his contribution in a given year, the General Partner initially, and if the General Partner declined, all of the other partners, if they wished, could purchase his interest.

7. The partnership was borrowing more money than the purchase price of the property; and it was this borrowing, the prepayment of interest, and the payment of Mr. Scott's compensation in the form of a one-time management fee which created the extremely advantageous tax treatment for the year 1973.

8. The interest of the Limited Partner, Emanual Katzin, would not be assigned to an unlimited number of persons; rather Katzin's assignees, the purchasers of the participation interests, would not exceed 30 persons and could be a number materially smaller than 30. (See page 23 of Plaintiffs' Exhibit 4).

9. The holders of the participation interests would not be entitled to take any part in management of the partnership affairs. The holders of 55% of the participation interest had the right to object to and prevent a *sale* of any part of the partnership property. It is undisputed in this record that the partnership property was never sold and thus the right of the holders of 55% of the participation interests to object to and prevent a sale of all or part of the property never matured and never became material.

10. Virtually all of the money paid by the purchasers of participation interests in December 1973, i. e., $250,000, would go to the General Partner as his one-time management fee (see page 26).

11. Purchasers of the participation interests did not themselves become "limited partners" but were accurately designated and described in the affairs of the partnership as "assignees of participation interests." (See pages 27, 28, 35 and 43 of Plaintiffs' Exhibit 4).

12. During the life of the partnership, the General Partner could become the owner of a substantial portion or even all of the ownership interests of the assignees of participation interests. This could occur occur in one of three ways:

First, there was no prohibition in Plaintiffs' Exhibit 4, and nothing in Mr. Scott's representations to the investors which prevented his becoming the assignee of a participation interest. The plaintiffs testified that Scott told them that he could not be a limited partner, and this was true. Certain of the plaintiffs had participated in investments with Scott previously, and knew that in those previous investments, Scott had been, in effect, an assignee of a participation interest. These plaintiffs testified that it was their *assumption* that Mr. Scott's ownership interest would not exceed the 20% to 30% interest which he had enjoyed in other of the investments which they had participated in with him, but none of the plaintiffs was able to testify that Scott had so represented to them.

Second, the General Partner, Scott, could become the owner of all or a substantial portion of all of the interests of the assignees of the participation interests if such assignee failed to make additional contributions. In that situation, the General Partner had the right to contribute the assignee's proportionate share of the capital call, at which time the General Partner would become the owner of the noncontributor's ownership as represented by his certificate of participation interest.

Third, the General Partner could become the owner of all or a substantial portion of the ownership of the assignees if a

holder of a participation interest wished to sell his interest. Under that situation, the owner of the participation interest was required to offer his interest initially to the General Partner. (See pg. 35 of Plaintiffs' Exhibit 4).

13. The General Partner Scott had complete authority to manage, control and operate the affairs and business of the partnership and had " . . . full, complete and exclusive discretion with respect thereto." (See page 30 of Plaintiffs' Exhibit 4).

14. The General Partner was free to deal with the partnership in an arm's-length manner, even if a conflict of interest developed between the General Partner and the partnership. (See pages 31 and 59–60 of Plaintiffs' Exhibit 4).

15. The General Partner would have no liability to the partnership or any of the partners for mere ordinary negligence, and liability could be imposed upon the General Partner only for bad faith acts, or acts constituting gross negligence or deliberate acts of misfeasance. (See page 32 of Plaintiffs' Exhibit 4).

16. The General Partner was free to "walk away" from the project at any time by merely assigning his interest in the partnership to "any person, firm or corporation selected by him . . ." (See pages 33 and 34 of Plaintiffs' Exhibit 4).

17. The original Limited Partner, Katzin, stated and expressed his intent to assign substantially all of his economic interests to the purchasers of participation interests (see page 34 of Plaintiffs' Exhibit 4); however, there was no representation whatsoever, either in Plaintiffs' Exhibit 4 or in any oral representations by Scott, that the planned transaction would be aborted or that the purchasers of participation interests would be refunded their money if all 99 participation interests were not sold. Plaintiffs, it seems to the Court, seek to read such a representation into Plaintiffs' Exhibit 4 (Confidential Memorandum), but a detailed examination of that exhibit and the testimony relating to the oral representations of Scott persuade this Court that, as a matter of law, no representation of this nature was made or may be reasonably implied.

18. The partnership would terminate upon the "disposition" of all of the partnership property. (See page 37 of Plaintiffs' Exhibit 4). It is true that the owners of 55% of the "participation interests" could prevent a "sale" of the partnership property. There is nothing, however, in either Plaintiffs' Exhibit 4, or in Scott's oral representations to the plaintiffs which would prevent the occurrence of the event which actually happened; that is, a situation in which Scott determined that economic conditions had created a situation whereby the investment of additional money into the project would in effect be pouring good money after bad, and thus made a recommendation to the participants that they make no further investment and allow the property which was purchased to be repossessed by the seller.

In mid-December of 1973, only 45% of the participation interests had been sold. In itself, this was not particularly surprising since the private offering had commenced only with the completion of the confidential memorandum dated November 19, 1973.

Despite the fact that only 45% of the participation interests had been sold, Mr. Scott was able to proceed with the purchase of the property and exercised the option received from Dr. Thorn by in effect trading his right to a portion of the $245,000 management fee for 55% of the participation interests. This enabled him to close the transaction on December 15, and move forward with his efforts to sell the property for a price which would yield a speculative profit to the owners of the participation interests.

Mr. Scott did not advise the owners of the participation interests of this development until March 6, 1974, when he forwarded to them Plaintiffs' Exhibit 3, listing the owners of the participation interest. In addition, in March, in the same letter (Plaintiffs' Exhibit 5) Mr. Scott forwarded to each of the investors a letter of non-distributive and investment intent which he

requested each investor to sign and return at the earliest possible date.

In this Court's opinion, it is a critical fact that each of the plaintiffs herein knew by virtue of Mr. Scott's letter of March 6, 1974, and the enclosures therein, that Mr. Scott had become the owner of 55% of the participation interests. Having this knowledge, each of the plaintiffs signed the letter of nondistributive and investment intent, and returned it to Mr. Scott. In this letter, each of the plaintiffs made the following significant representations, to wit:

A. The total cost of the investment was not material when compared to the investor's total financial capacity.

B. Each investor had experience in business enterprises or investments entailing a high degree of risk of a similar nature to the risk involved in this investment or had obtained independent financial advice with respect to the investment.

C. That the investor understood " . . . the nature of the investment being made by me and the financial risk thereof." (See Plaintiffs' Exhibit 6, page 3).

D. That the investment offering (i. e., Plaintiffs' Exhibit 4) " . . . contains sufficient information on the nature of my investment."

E. That each investor did not, because of the sufficiency of the information contained in the investment offering, " . . . desire any further information or data concerning the limited partnership."

During the first three quarters of 1974, Mr. Scott continued to make efforts to find a buyer for the property. At least two of the plaintiffs through their duly authorized agent, McDonald Lynch, acknowledged in writing that the defendant had made "thoughtful efforts" to sell the property. (See Plaintiffs' Exhibit 8). All of the plaintiffs admitted that during 1974, Mr. Scott had made diligent efforts to sell the property and had worked hard and effectively on their behalf.

Plaintiffs knew that defendant Scott was not performing the extensive work and incurring the extensive expenses which he incurred, solely in the speculative hope of making a real estate commission. Plaintiffs' Exhibit 4 clearly enunciated the concept that Scott was to be compensated for all of his work by a one-time management fee payable in 1973. In addition, plaintiffs, sophisticated investors and people of ordinary common sense, knew that Scott had incurred considerable expense in connection with this matter and done a great deal of work. Someone obviously paid the $50,000 to obtain and keep the option viable. Scott had obviously incurred the expense of publishing the Confidential Memorandum. Scott had obviously incurred attorneys fees in connection with the preparation of attorney Sonfield's detailed letter opinion appearing in the Confidential Memorandum.

Despite Scott's extensive work prior to December 1973, the bulk of his work lay in the future. The real contribution which he was to make to the enterprise was the effort to obtain a purchaser for this package to enable the owners of the participation interests to obtain not only the tax benefits which they received but also a speculative profit. Plaintiffs knew that it was contemplated that they would pay Scott for this work, and they in fact did pay him and were the beneficiaries of his work. He was not in the position of a lawyer who works on a contingency fee. Scott was in the position of a lawyer who is employed to expend his best efforts in a client's cause; here, he expended his best efforts, under all the testimony, and obtained a not disastrous but less than glorious result. Plaintiffs knew that they were supposed to pay him for his work but now seek to avoid doing so. The Biblical injunction that the laborer is worthy of his hire certainly has here some arguable applicability.

In August of 1974, President Nixon left office, and thereafter economic conditions in the real estate market in the Houston area became extremely depressed. Many limited partnerships of this nature ceased operations.

On December 17, 1974, defendant Scott wrote all of the holders of participation interests a letter advising them that in his opinion, economic conditions during 1975 would not materially improve. He further stated that he had not been able to find a purchaser during 1974, and there was little reason to predict that he would be more successful during 1975. He therefore made the following recommendation:

Therefore, my recommendation is that the partnership not invest any additional funds in the property at this time. (See Plaintiffs' Exhibit 7).

A study of page 55 of Plaintiffs' Exhibit 4 reveals the reason why any investor who contemplated an inability to sell the property before November 1975 would be alarmed. The annual cash invested under the plan contemplated by Plaintiffs' Exhibit 4 was $250,000 for 1973, $173,860 in November 1974, but in November of 1975, the amount to be invested increased dramatically to the sum of $476,935.

There is no evidence, in this Court's view, which would justify a conclusion that Scott's recommendation in his letter of December 17, 1974 was made in bad faith. Even if it be assumed that Mr. Scott's recommendation was negligent (and there is no evidence to justify such a conclusion), it is not the function of the 1933 or 1934 Securities Acts to remedy or provide a cause of action for managerial mis-management. See: *Green v. Santa Fe Industries,* 430 U.S. 462, 97 S.Ct. 1292, 51 L.Ed.2d 480 (1977).

There is one inconsistency in the evidence presented to the Court, although in this Court's view it does not raise a fact issue for the jury. Mr. Scott testified that he would have been financially able to make his contribution to the capital of the enterprise in November 1974 but chose not to do so simply because of economic conditions. Several of the plaintiffs testified that Mr. Scott told them that he did not have the money to make his contribution in November of 1974. Mr. Scott testified that what he said was that he did not have money to put in a project of this nature at this time— not that he did not have the money.

Even accepting plaintiffs' view of this matter, the Court is persuaded that there is no material issue for jury resolution. The most important reason for this conclusion is that the Court has determined that the Court cannot grant recission—and recission, plus attorneys fees and exemplary damages, was the only relief which the plaintiffs sought. Secondarily, however, the Court has determined that even if plaintiffs' view concerning the reasons for Mr. Scott's determination not to contribute additional funds to the partnership in November 1974 is correct, no cause of action in the plaintiffs is established for the following reasons:

1. Plaintiffs were thoroughly advised in the Confidential Memorandum (Plaintiffs' Exhibit 4) that Mr. Scott would continue in other enterprises and that a conflict of interest might develop between the General Partner and the holders of the participation interests. (See Plaintiffs' Exhibit 4, pages 59–60).

2. Plaintiffs were told that the ownership of the participation interests would not be widely distributed and in fact knew that less than 30 individuals would be holding the participation interests. Plaintiffs also knew that owners of participation interests probably would be persons friendly to Mr. Scott and with respect for his judgment. Certainly no one would invest in a project of this nature, wherein Mr. Scott had complete control of the enterprise, without considerable faith in Mr. Scott's acumen and integrity. Plaintiffs, therefore, were well aware of the fact that if Mr. Scott determined in the latter part of 1974, for whatever reasons, that it was inadvisable to continue the investment, then a substantial portion of the holders of participation interests, no matter who they were, might well share Mr. Scott's view.

A simple illustration illuminates this point. Suppose for example, that

instead of becoming the owner of 55% of the participation interests, Mr. Scott had sold those participation interests to eleven individuals, each of whom owned 5%. Assume further, however, that Mr. Scott in November 1974 advised all of the holders of participation interests that further investment in the project was inadvisable and that a substantial number of the holders of the participation interests shared his view and declined to invest further moneys. Unless the plaintiffs herein, in that set of circumstances, were willing to bear not only their own proportionate share of the 1974 payments, but also a share of all of the non-contributing holders of participation interests who agreed with Mr. Scott's view, the project would have been aborted, just as it was aborted.

The point is, in the Court's view, that the risks to which the plaintiffs were subjected, were large to begin with, known to be large, and were not materially increased by the fact that Mr. Scott himself became the owner of 55% of the participation interests.

Insofar as this record reveals, Hines H. Baker, Jr., N. G. Beard, Thomas E. Kormanik, and John Sterling Meyer, who collectively owned approximately 12½% of the participation interests agreed with Scott's recommendations, made no further contributions to the partnership, made no complaint after December 17, 1974, and did not join in the lawsuit with the plaintiffs herein, who own approximately 30% of the participation interests.

It is apparent from the testimony, and from Defendant's Exhibit 2, that on December 26, 1974, the holders of the participation interests, except for Isberg, Kearny and Kathleen B. Lynch, met with Mr. Scott in his office. An arrangement was worked out whereby each of the holders of the participation interests would forward his pro rata share of $188,200 to the General Partner to be placed in an escrow account for the payment of taxes and interest due on the existing lien. These moneys, however, i. e., the $188,200, would not be paid out until the General Partner was able to establish a development corporation, develop the land, install streets, and sell the various tracts in small parcels to create cash flow.

Mr. Scott, as he was entitled to do under the agreement identified as Plaintiffs' Exhibit 4, exited the enterprise, and assigned the general partnership interest to another individual.

Although the record is not clear as to the reasons for the failure, this new effort was not successful and ultimately Dr. Thorn foreclosed on the property in May of 1975.

■ Although this limited partnership did not achieve its ultimate purpose of selling the property in question at a speculative profit, the plaintiffs herein, from mid-1974 until May of 1975, when Dr. Thorn foreclosed on the property, realized the following very significant benefits:

1. An immediate tax write-off, which for some high bracket taxpayers would actually result in a very substantial immediate cash flow profit.
2. Additional tax benefits during 1974.
3. The significant opportunity (during a period from December, 1973 until spring, 1975) to realize a large, speculative profit.

In this situation there is simply no way to place plaintiffs in the same position they would have been in were it not for the alleged misstatements and omissions. Plaintiffs have enjoyed the advantages described. To give the plaintiffs their money back with interest, and thus in effect treat them as if they had placed their money in a risk-free federally insured savings and loan, would be grossly inequitable. Plaintiffs' position is like that of a player at a roulette table who pays for the speculative chance of making a large gain and then wants his money back when the wheel has spun and he has not made the speculative gain. In fact, plaintiffs' position is even more inequitable than that of the hypothetical roulette player. The roulette player has, at least

presumably, paid for his speculative chance with his own funds. Plaintiffs bought their speculative chance, at least in part, if not wholly—not with solid after-tax dollars—but with dollars which otherwise would have been paid within a very few weeks to the United States Internal Revenue Service; and even if plaintiffs were required to report the benefits received by a judgment of this Court as income in the year in which it is received, there is no way for this Court to determine that such additional income in 1978 or 1979 (in the light of whatever tax shelters the plaintiffs may have discovered in those years), would in any way be equivalent to the tax benefits received by the plaintiffs in 1973 and 1974.

*Applicable Authority*

A review of fundamental principles of equity jurisprudence supports the Court's conclusion. The basic principles are:

1. "As a general rule, unless the parties can be restored to the situation which they occupied prior to entering into the contract, a court of equity is reluctant to decree recission . . . If the parties cannot be put back in status quo, the court will decree relief only where the clearest and strongest equity imperatively demands it." 27 Am.Jur.2d Equity § 31, pg. 554.

2. ". . . [E]quity aids one who has been vigilant, not one who has slept on his rights. A court of equity may therefore refuse relief to one who has been dilatory or wanting in diligence in prosecuting his cause of action . . . The maxim has been employed broadly to deny relief to those who neglect to take care of themselves, and who thereby suffer losses which ordinary care would have prevented. The situation which is most frequently contemplated by the maxim is that which is created where the individual having knowledge of rights which he may assert, has failed to act, with the result that another has acted upon the assumption that such rights do not exist or will not be asserted." 27 Am.Jur.2d Equity § 130, pg. 658.

■ In the case at bar, the evidence establishes conclusively that after March 1974, Mr. Scott continued his efforts to dispose of the property and continued his admittedly thoughtful and effective efforts to obtain a purchaser. (See Plaintiffs' Exhibit 8). Plaintiffs seek recission; but plaintiffs have produced no evidence that the plaintiffs made any effort whatsoever to seek recission from March 1974, when they had full knowledge concerning Scott's 55% ownership of the participation interests, until the filing of this lawsuit on November 3, 1975, 20 months later. Plaintiffs cannot equitably take the benefit of Mr. Scott's efforts and then complain of a situation of which they had complete knowledge in March of 1974.

■ A detailed review of the cases relating to the measure of damages under actions undertaken pursuant to the Securities Act of 1933 and the Securities Act of 1934 reveal that the equitable maxims set forth above are applicable in actions under the Securities Laws and further reveal that while the federal judiciary has been both liberal and ingenious in fashioning appropriate remedies for persons actually damaged by violations of the Securities Laws, a plaintiff must satisfy the basic requirement of proving facts from which the Court may fashion appropriate relief.

The court in *Myzel v. Fields,* 386 F.2d 718 (8th Cir. 1967), *cert. denied* 390 U.S. 951, 88 S.Ct. 1043, 19 L.Ed.2d 1143 (1968), stated quite simply at 742:

Recision calls for cancellation of the bargain, and the return of the parties to the *status quo ante*; where this is impossible because of the disposal or retirement of the stock, . . . what restitutional damages are to be awarded must depend upon the facts of the particular case.

■ As a general rule a defrauded purchaser must establish the difference between the value of what he received and the value which he would have received absent the misrepresentation or concealment, but not including damages covering ". . . 'the expected fruits of an unreal-

ized speculation'." *Sigafus v. Porter,* 179 U.S. 116, 125, 21 S.Ct. 34, 37, 45 L.Ed. 113 (1900). This fundamental rule has been adopted by the federal courts as the basic measure of damages under 10(b) and Rule 10b–5. *Affiliated Ute Citizens of Utah v. United States,* 406 U.S. 128, 92 S.Ct. 1456, 31 L.Ed.2d 741 (1972); *Janigan v. Taylor,* 344 F.2d 781 (1st Cir. 1965); *Levine v. Seilon, Inc.,* 439 F.2d 328 (2nd Cir. 1971); *Rochez Bros. v. Rhoades,* 491 F.2d 402 (3rd Cir. 1974); *Wolf v. Frank,* 477 F.2d 467 (5th Cir. 1973); *Garnatz v. Stifel, Nicolaus & Co., Inc.,* 559 F.2d 1357 (8th Cir. 1977); *Madigan, Inc. v. Goodman,* 498 F.2d 233 (7th Cir. 1974); *Foster v. Financial Technology, Inc.,* 517 F.2d 1068 (9th Cir. 1975); *Richardson v. MacArthur,* 451 F.2d 35 (10th Cir. 1971). The Court in *Harris v. American Investment Co.,* 523 F.2d 200 (8th Cir. 1975) notes the origins of the out-of-pocket rule and refers to Note, *Measurement of Damages in Private Actions under Rule 10b–5,* 1968 Was.U.L.Q. 165, 172, on the difference between the two measures of damages:

> [The out-of-pocket rule] allows recovery of the difference between the actual value of what the injured party gave and what he received. In contrast with restitution damages, the plaintiff recovers what he has lost, rather than what the defendant has gained. The injured investor is given nothing for the loss of benefit that he would have enjoyed had the defendant's representations been true.

■ Consequential damages are also recoverable in a securities case, as they are at common law for fraud, if the defrauded buyer can establish the requisite causal nexus with a good deal of certainty. *Zeller v. Bogue Electric Mfg. Corp.,* 476 F.2d 795 (2nd Cir. 1973). Plaintiffs in the case at bar have not introduced evidence from which reasonable men could conclude that consequential damages were suffered.

Conceivably plaintiffs might have brought their case within the rule followed by the Eighth Circuit in *Garnatz v. Stifel, Nicolaus & Co., Inc.,* 559 F.2d 1357 (8th Cir. 1977). The court there refunded the plaintiff his purchase price of the securities, reduced by any value received as a result of the fraudulent transaction. Garnatz was not a sophisticated trader but only a modest investor who was interested in long-term, non-speculative investments. The court was persuaded that the gravamen of the action was not whether plaintiff paid a fair price for the bonds, but that he bought them at all. The court noted at 1360:

> Absent defendants' representation regarding the safety of the program, plaintiff's express disdain for speculation undoubtedly would have precluded his participation; but the fraudulent promise of a low-cost, income-maximizing, and risk-free investment package overcame plaintiff's caution. Under the circumstances, we believe that a recissory damage measure . . . is appropriate.

■ In the case at bar, however, plaintiffs did not prove the specific value they received in tax write-offs and did not, and could not, establish the value of the speculative opportunity which they enjoyed.

■ A party seeking recovery under the Securities Act cannot recover losses caused by his own failure, once he has reason to know of the fraudulent conduct, to take reasonable steps to avoid further harm. *Foster v. Financial Technology, Inc.,* 517 F.2d 1068 (9th Cir. 1975). Or as the court in *Richardson v. MacArthur,* 451 F.2d 35, 43 (10th Cir. 1971) phrased it: "A purchaser cannot, however, feign ignorance in the face of obvious fraud with immunity." In the present case plaintiffs had complete knowledge concerning Scott's ownership of 55% of the participation interests in March 1974, but took no action seeking recission until November 3, 1975.

In *Garnatz v. Stifel, Nicolaus & Co., Inc., supra,* at 1360, the Eighth Circuit said that the court's ". . . function is to fashion the remedy best suited to the harm." The trial court in calculating damages not only may, but should, look to particular factors, unique in each case, in reaching that determination. *Affiliated Ute Citizens of Utah v. United States, supra.*

It is undisputed that the plaintiffs' certificates of participation had considerable value at the time the plaintiffs received their certificates. There is no proof that the value which the plaintiffs received is in any degree different from the value they would have received absent the alleged misrepresentations and concealments.

*Relevancy of Tax Benefits*

■ In retrospect, it is now apparent that this case was really decided when the Court ruled on the plaintiffs' motion in limine. The plaintiffs, prior to the introduction of evidence, attempted to persuade the Court that no evidence should be introduced relating to the tax aspects of this transaction. The Court, at that time, overruled the motion in limine because it was apparent to this Court that in any investment of this nature, tax considerations were crucial. A review of the exhibits reveals the correctness of that analysis. Plaintiffs' Exhibit 4 (the key documentary evidence) reveals that federal income tax consequences were discussed thoroughly at page 61 of the Confidential Memorandum (Plaintiffs' Exhibit 4). In addition, Plaintiffs' Exhibit 4 in connection with the pro forma financial forecast lists detailed projections concerning tax consequences. Tax consequences are discussed thoroughly in the opinion of counsel, beginning at page 65 of Plaintiffs' Exhibit 4.

Requiring the jury or this Court to try this case without reference to the tax consequences of the transaction would be requiring the jury and the Court to live in an artificial "never-never land." The plaintiffs' position that the tax consequences of this transaction should be ignored is simply not realistic and is tantamount to requesting this Court and the jury to try this case blindfolded.

Plaintiffs cite *Cooper v. Hallgarten & Co.,* 34 F.R.D. 482 (S.D.N.Y.1964) and *G & R Corporation v. American Security & Trust Co.,* 173 U.S.App.D.C. 215, 227, 523 F.2d 1164, 1176 (1975).

*G & R Corporation v. American Security* was a case to recover funds diverted from a joint venture account by a bank. The court merely held that appellant was not required to do the extremely difficult task of making an accurate evaluation of tax benefits and burdens over a period of several years, and that in any event, the defendant bore the burden of proving mitigation of damages. That case, unlike the case at bar, did not involve a situation in which for certain high bracket taxpayers, there would have been no loss at all. The case also did not involve a transaction in which a tax benefit to be received was one of the principal motivating forces in the investment. In addition, that case did not involve a claim for recission, where the court must make a determination as to whether or not it is even possible to restore the status quo.

The trial court in *G & R Corporation* relied primarily upon *Hanover Shoe Corp. v. United Shoe Machinery Corp.,* 392 U.S. 481, 88 S.Ct. 2224, 20 L.Ed.2d 1231 (1968) which holds that tax benefits received by Hanover when it purchased machines rather than renting them should not be deducted from the treble damages awarded for antitrust violations. *Hanover Shoe* was a situation in which the plaintiff, a buyer, was able to show that the price charged him was illegally high and was able to show the specific amount of the overcharge. *Hanover Shoe* was a case for tortious deprivation of profits, and not a case where the plaintiff sought recission.

*Cooper v. Hallgarten, supra,* refutes the plaintiffs' position. It is true that Judge Weinfield there declined to force the plaintiff to produce his tax returns, but Judge Weinfield, in connection with a high risk oil and gas deal sold to a high bracket doctor, said:

> There can be little doubt of the high degree of risk and the speculative nature of the oil and gas ventures, or that plaintiffs sought a tax-favorable outlet for his funds; as much appears to be conceded by the moving papers. In any event, plaintiff *may be fully questioned with respect thereto* as tending to support not only the defendants' denial of misrepresentation, but also to rebut plaintiff's

claim of reliance thereon. (Emphasis added)

34 F.R.D. 482. In the case at bar the plaintiffs' tax returns were not introduced in evidence, no effort was made to introduce them in evidence, and as far as this Court knows, they were not actually produced for inspection by defendant or defendant's counsel. The Court did order plaintiffs to bring their tax returns to court so that precise information would be available, but none of the plaintiffs was asked for detailed information concerning his tax returns. One plaintiff did testify concerning his gross and net income, but the balance of the plaintiffs were not even asked or required to reveal information concerning their gross and net incomes.

In any event, *Cooper v. Hallgarten, supra,* as the Court reads it, supports the view that tax considerations in a transaction of this nature are highly relevant and that a plaintiff may be questioned concerning such tax considerations in connection with the issue of whether a misrepresentation actually occurred.

This Court's basic reasoning was that a finder of fact simply cannot understand a transaction of this nature without a basic understanding of the tax consequences. This view appears to be supported by the language in *Cooper v. Hallgarten, supra.*

*Wiesenberger v. W. E. Hutton & Co.,* 35 F.R.D. 556 (S.D.N.Y.1964) affords some support for the plaintiffs' position; however, that case did not involve the issues here at bar but merely dealt with the question of whether or not, at a very preliminary stage of the proceedings, the defendant could compel the production of the plaintiff's income tax returns. The question as to whether or not the jury, and the fact finder, were entitled to understand the transaction by understanding the tax consequences was not in issue or discussed in that case.

Most important on this issue, however, is the fact that the Fifth Circuit, which governs and supervises the activities of this Court, has clearly stated that in a transaction of this nature, tax considerations are relevant and the proper subject matter of admissible evidence. See: *Dupuy v. Dupuy,* 551 F.2d 1005, 1025 (5th Cir. 1977). The Fifth Circuit panel there, in discussing the testimony of one of the damage experts, said:

. . . When discounts for both the *tax benefits* of the Monteleone investment and the minority status of Milton's stock were considered, Derbes reached a value of $460,000. When only the *tax benefits* were discounted, the figure arose to only $658,000. (Emphasis added)

551 F.2d 1005, at 1025.

*Was Defendant Guilty of Material Misrepresentations or Omissions upon which Plaintiffs Relied to Their Detriment?*

Thus far in this opinion the undersigned has attempted to limit recitation of evidence to evidence actually introduced at the trial of this case. In an effort to determine, however, whether a motion for summary judgment would have been proper in this cause, this Court has reviewed all of the deposition testimony and the sworn answers to interrogatories.

The factual picture revealed by the evidence at trial is virtually complete, and is supplemented only to the extent that the deposition testimony reveals more detail concerning events which occurred between the abortion of the public offering (Plaintiffs' Exhibit 2) and the completion of the Confidential Memorandum of November 19, 1973 (Plaintiffs' Exhibit 4) and reveals fully the important role of McDonald Lynch in this transaction.

The evidence at trial reveals that at all material times plaintiffs Kathleen B. Lynch and Robert Lynch acted through their father, McDonald Lynch, a mature, thoroughly experienced investor, with considerable business experience in many varied activities. At the trial only a portion of McDonald Lynch's deposition was introduced in evidence. Review of those portions of Mr. Lynch's deposition which were not introduced in evidence reveal more detail concerning the period from the abandonment of the private offering on October 15, 1973 and the preparation of the Confidential Memorandum dated November 19, 1973.

McDonald Lynch learned of the private offering and was interested in the private offering and in the property. McDonald Lynch, in addition to his other business activities, was actively involved in a company which specialized in the preparation of computer analyses of real estate investments. Mr. Lynch and his employees became interested in the Thorn property because of its profit potential and also because of the opportunity for performing a computer analysis of the economic possibility of the project which would form a model for future computer analyses. Mr. Lynch, through his employees performed a detailed computer analysis of a number of possible arrangements with reference to the financing of the property, and thereafter conceived the basic financing arrangement which is reflected in Plaintiffs' Exhibit 4, the Confidential Memorandum. The essential fundamentals of the plan reflected by Plaintiffs' Exhibit 4 are that title to the option was to pass from defendant Scott to a corporation controlled by Mr. Lynch called the React Corporation. React Corporation would then actually purchase the property from Dr. Thorn with a $3,600,000 note and $400,000 prepayment of interest.

The funds to pay the prepaid interest would be obtained from companies affiliated with React. React and its affiliated companies would be basically compensated for their risk and their investment by a $240,000 8¾% note and the spread between $4,000,000 and $4,600,000.

While all of the details of this somewhat complex transaction were not made known to the other purchasers of participation interests, the purchasers of participation interests did know and were told the following facts, to wit:

1. The purchase price of the property was $4,640,000.

2. The total borrowing of the corporation was in excess of the purchase price, and this situation in which the partnership borrowed more money than it was paying for the property was the reason why the transaction could be so structured that an inves-

tor in December of 1973 received $2 of deduction for every $1 of investment.

As the matter eventually developed, React and its affiliated company which provided the financing were the most seriously injured parties. The $4,640,000 purchase price was never paid, and thus React and its affiliated companies never enjoyed the spread between $4,000,000 and $4,640,000. The money advanced by React and its affiliated companies to enable the prepaid interest to be paid to Dr. Thorn was apparently lost insofar as React was concerned.

Plaintiffs have each given almost identical, vague and self-serving testimony concerning their contentions relating to alleged misrepresentations and concealments in Plaintiffs' Exhibit 4, and their alleged reliance thereon. Each of the plaintiffs has in effect testified that if he had known that the property was being sold twice on December 15, 1973, and if he had known that Scott had not sold all of the participation interests and had known that defendant Scott was to own 55% of the participation interests, he would not have invested his funds. This testimony, in the Court's view, in light of all of the facts, including those revealed in McDonald Lynch's total deposition, do not create fact issues, and a motion for summary judgment in this cause would have been proper. The Court reaches this conclusion for the following reasons:

1. Vague, self-serving speculative testimony concerning what a party would have done under different circumstances is generally not admissible. Such testimony would not have been admitted in evidence over a proper objection. Inadmissible evidence, even if admitted without objection, does not provide the basis upon which a verdict can be predicated.

2. Testimony of plaintiffs that they would not have invested had they known that "the property was sold twice on the same day" is simply meaningless. It is a gross and misleading over-simplification to say that

"the property was sold twice on the same day." Mr. Scott, Mr. Lynch and attorney Robert Sonfield had prepared a detailed, and apparently totally legal, complex arrangement which provided for the enormous tax advantages which could be obtained by borrowing more than the purchase price.

For an investor to simply, blandly state in general terms that he would not have invested if he had known that "the property was going to be sold twice on the same day" is completely meaningless where the investor in question was a sophisticated investor, knew that the promoter had arranged a transaction whereby more money was being borrowed than the property was sold for, and that the enormous tax advantages in question could be obtained only because of the highly leveraged nature of the transaction. The investors were also cognizant of the fact that the promoter was being compensated by a one payment management fee to be paid at the time of closing.

The testimony of the plaintiffs to the effect that they would not have invested if they had known that Scott was to own 55% of the limited partnership participation interests is likewise essentially meaningless because Scott's ownership did not materially increase their risk. See discussion supra at page 1057.

It could be contended that had Scott not become the owner of the 55% interest, his advice would have been more objective, and he would have had a greater incentive to continue the viability of the partnership. Such a contention is not tenable. It is undisputed that economic conditions changed dramatically in the late summer of 1974. It is also undisputed that Scott, under the plan set forth in the Confidential Memorandum, had already received his management fee. It is mere speculation to assert that if the 55% of the participation interest which Scott took in lieu of $137,500 of his management fee had been owned by other persons, that such other persons would have been more eager than Scott, or more able than Scott, to produce the funds required to continue the enterprise after December 1974.

Plaintiffs also complain that Scott did not reveal that the private offering had failed. Plaintiffs testify that if they had known of this failure and the other alleged concealments, they would not have invested. This general, self-serving testimony—which is in addition to its other infirmities a manifest over-simplification—is similarly without substantial probative force. In almost any real estate investment it is inevitable that there are negative factors in some of the past history of the property. The Confidential Memorandum did not purport to set out a detailed history of the property, its owners or the previous efforts to sell the property. Any interested investors undoubtedly could have obtained this history if interested—and in fact McDonald Lynch, who acted for the two Lynch plaintiffs, had full knowledge concerning the details of the public offering.

The key facts here are that the plaintiffs were either themselves, or were represented by, highly sophisticated and knowledgeable investors, that the plaintiffs knew from the Confidential Memorandum that the partnership was borrowing more money than the purchase price of the property, and that somebody had to be lending the funds in excess of the purchase price of the property. The plaintiffs therefore must have known, upon any reflection, that the entity making a loan in excess of the purchase price of the property had a highly speculative position and must therefore be appropriately compensated. Obviously, a lender making a loan, in which no individual would have any personal liability, and in which he would at best have a second mortgage position inferior to the mortgage for the entire purchase price, must receive some compensation or consideration for the immense speculative risk undertaken. Thus, any knowledgeable and sophisticated investor, reading the Confidential Memorandum, would realize and would be on notice that React Corporation, or whoever arranged this highly leveraged situation in which the partnership was borrowing more than the purchase price of the property, had to be

compensated handsomely at some stage of the proceeding, or at least have the speculative possibility of large gains. React and its affiliated companies were lending money upon which there was no personal liability, and no real security. In return it received the speculative chance of realizing the difference between $4,000,000 and $4,640,000, a speculative possibility which never materialized. While some of the plaintiffs may not have been advised of all of the details of this situation, the material economic realities were totally apparent from Plaintiffs' Exhibit 4.

It should also be noted that each of the plaintiffs was in a position to have obtained full details concerning the matter either in December of 1973 or in March of 1974. In fact, in March of 1974, each of the plaintiffs in executing the letter of nondistributive and investment intent affirmatively represented to Mr. Scott that he did not " . . . desire any further information or data concerning the limited partnership."

Plaintiffs place heavy reliance upon the doctrine of *Affiliated Ute Citizens of Utah v. United States,* 406 U.S. 128, 92 S.Ct. 1456, 1472, 31 L.Ed.2d 741 (1972), where the Court said:

> Under the circumstances of this case, involving primarily a failure to disclose, positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in the making of this decision. . . .
> This obligation to disclose and this withholding of a material fact establish the requisite element of causation in fact. *Chasins v. Smith Barney & Co.,* 2 Cir., 438 F.2d 1167 at 1172.

Applying the language of *Affiliated Ute,* it is significant to inquire whether a reasonable investor might have considered the facts allegedly omitted as being material and important in the making of his investment decision.

In view of the fact that it was clearly revealed that React Corporation and its affiliates were enabling the partnership to gain enormous tax advantages by making a highly speculative and risky loan, in view of the fact that any intelligent investor must have realized that such a loan would be made only if there were opportunity for large speculative gains, it cannot be reasonably contended, and a reasonable juror (in this Court's opinion) could not conclude, that a reasonable investor might have considered additional details important in making his decision.

In view of the fact that Scott's ownership of 55% of the participation interests did not materially increase the risk inherent in this already very speculative venture, this Court concludes as a matter of law that a reasonable investor could not have considered Scott's ownership of 55% of the participation interests important in the making of his initial decision to invest. (See discussion above at p. 1057.)

Although the facts of *Piper v. Cris Craft Industries,* 430 U.S. 1, 97 S.Ct. 926, 51 L.Ed.2d 124 (1977) are not here relevant, because that case involved a proxy contest, Justice Blackmun's thoughtful concurring opinion casts considerable light upon the proof which a plaintiff in a securities case must make concerning causation. Justice Blackmun said:

> In the case of a suit by a tender offeror to recover damages suffered as a result of securities law violations by its competitors, causation is a far more complex issue. It is not enough for the offeror to prove that the competitor's violations caused the shareholders of the target corporation to act in a certain way. In addition, the offeror must show that the shareholders' reactions to the misstatements or omissions caused the injury for which it demands remuneration. Even though the *Mills* [*Mills v. Elective Auto-Lite Co.,* 396 U.S. 375, 90 S.Ct. 616, 24 L.Ed.2d 593]-*Affiliated Ute Citizens* presumption satisfies the requirements for proof of the first element of causation, the absence of any evidence that the violations might have altered the outcome of the contest for control would leave me unable to hold that the securities law

violations caused the disappointed contestant's ultimate injury—its failure to acquire control of the target corporation. 97 S.Ct. at 954.

 Applying this language and reasoning to the case at bar, the ultimate injury of which the plaintiffs here complain is the premature (in their present view) termination of the partnership's interest in Dr. Thorn's property. To conclude that the ultimate result would have been different had Scott's 55% ownership of the participation interests been more widely distributed requires one to engage in totally unsupported speculation and conjecture. Thus, there is no proof that the alleged violation, i. e., the alleged omissions, in any way would have altered the ultimate result and thus plaintiffs, applying Justice Blackmun's reasoning, have totally failed to establish that the alleged omissions in any way caused or contributed to the plaintiffs' "ultimate injury."

The nature and extent of the leveraging accomplished in this transaction would be apparent even to an unsophisticated home buyer, who realizes that if he is able to borrow 90% of the purchase price of a house in this day and age, he has accomplished a veritable "coup." In this case, the investors were not dealing with a traditional, readily marketable house, the market price of which may be easily and accurately determined. The parties were dealing with a large tract of land, for which there was obviously no immediate and compelling purchaser. The parties were dealing with a large tract involving substantial investment, in which only a large developer such as Friendswood, Gerald Hines, or such other major developer, or a very wealthy individual, would be a potential purchaser. Despite the somewhat uncertain market value of the tract in question, these purchasers of participation interests were enabled by virtue of the handiwork of Mr. Scott, Mr. Sonfield, and Mr. Lynch, to obtain not 90% financing, but 110% financing. Obviously the source of this liberal financing was taking a large speculative risk, for which he could be compensated only by an opportunity to participate handsomely in the hoped-for speculative profits. The plaintiffs may or may not have taken the trouble to analyze Plaintiffs' Exhibit 4 sufficiently so as to discern these palpable realities; but if the realities were clearly disclosed, which this Court finds they were, there has obviously been no material misrepresentation or material failure to disclose.

For the reasons stated, the Court has concluded (as a matter of law) that there was here no misrepresentation or concealment of a material fact, and that had defendant filed an appropriate motion for summary judgment before trial, supported by proper affidavits and the depositions here on file, that the granting of summary judgment for the defendant would have been appropriate.

For the reasons stated, the Court is, contemporaneously herewith, entering judgment for the defendant.