UNITED STATES of America, Appellee,

v.

**William RANNEY, Defendant, Appellant.**

UNITED STATES of America, Appellee,

v.

**Dennis CIOFFI, Defendant, Appellant.**

Nos. 82–1593, 82–1594.

United States Court of Appeals,
First Circuit.

Argued June 6, 1983.

Decided Oct. 19, 1983.

Paul A. Manoff, Boston, Mass., by appointment of the Court, with whom Levine & Manoff, Boston, Mass., was on brief, for William Ranney.

Ronald Kovner, Washington, D.C., by appointment of the Court, with whom Robert F. Muse, Washington, D.C., was on brief, for Dennis Cioffi.

Bruce A. Singal, Asst. U.S. Atty., Boston, Mass., with whom William F. Weld, U.S. Atty., Boston, Mass., was on brief, for appellee.

Before McGOWAN,* Senior Circuit Judge, BOWNES, Circuit Judge, and SKINNER,** District Judge.

McGOWAN, Senior Circuit Judge.

William Ranney and Dennis Cioffi appeal their criminal convictions in district court for mail and wire fraud and conspiracy to commit the same. *See* 18 U.S.C. §§ 371, 1341, 1343 (1976). A federal grand jury in 1981 indicted Ranney and Cioffi as principals in a scheme to defraud investors who had purchased investment contracts for home heating oil from defendants' corporation. After an initial trial resulted in a hung jury, the government retried the defendants and obtained the convictions complained of in this appeal. Defendants raise numerous objections to their convictions, including assertions of collateral estoppel, improper admission of hypothetical questions, *Brady* violations, and prejudicial closing arguments by the prosecution. Because we find defendants' objections unpersuasive, we affirm.

I

In August 1979, Ranney and Cioffi joined with another principal, Stephen London, to form two Massachusetts corporations, Global Oil Corporation and World Petroleum Supply, Inc.[1] The two companies shared the same office over a bar owned by Ranney in downtown Boston. London and Cioffi served as successive presidents of Global, while Ranney occupied the post of president of World Petroleum Supply.

Between September 1979 and February 1980, Global sold 163 investment contracts for home heating oil to 130 investors throughout the country. The company received over one million dollars in revenues from these sales. Offers to buy were solicited through advertisements in major daily newspapers in large cities around the country with the notable exception of Boston. Global retained a staff of salesmen who were remunerated on a commission-only basis to respond to mail and telephone inquiries stimulated by the ads.

The contract offered by Global was in essence a futures contract. For a price of roughly $7,000, the investor purchased the right to buy 42,000 gallons of home heating

* Of the District of Columbia Circuit, sitting by designation.

** Of the District of Massachusetts, sitting by designation.

1. Global Oil later changed its name to U.S. Petroleum for reasons unrelated to this litigation. For purposes of simplicity, we refer to the company throughout this opinion by its original name only.

oil at a fixed price on a given day.[2] The investor's purchase price for the oil was usually based on the bid price prevailing on the New York market on the day the contract was purchased. If the market price rose sufficiently between that day and the expiration date of the contract, the investor ostensibly stood to realize a profit represented by the difference between the contract price and the market price, less costs.

Advertising and sales materials developed by Ranney and Cioffi made a series of representations to potential buyers aimed at enticing them into making the investment. Global represented, for example, that it was an experienced company with a sophisticated research department working constantly with well-placed sources around the world to monitor developments affecting oil prices and to maximize investor profits. For every ten-cent increase in the price of a gallon of oil, the company maintained, the holder of a single contract would realize $4,200 in profit.[3] Potential customers were also told that the oil being offered actually belonged to Global and was ready for delivery to contract-holders upon demand from storage tanks in New York harbor. The contract fee paid by investors, according to the company, went partly to defray delivery, storage and insurance costs for this supply of oil. Customers were urged to act quickly, however, because the supply was limited and might not last until even the next business day.

These representations did not accord with underlying reality. Rather than being the large, sophisticated oil-trading firm that it painted itself to be, Global was a new, grossly undercapitalized enterprise with no experience in oil commodity markets whatsoever and no research department. In contrast to the company's profit projections, oil prices had to increase by eighteen to nineteen cents per gallon for the buyer even to break even on his investment, much less turn a profit.[4] Global Oil owned no oil, had no storage facilities, and never incurred any costs for delivering, storing or insuring such a supply.[5] The company's assertions that its supplies were limited and might be gone tomorrow, therefore, were disingenuous. Contrary to these assertions, Global had no "supply" at all and simply endeavored to sell as many contracts to as many investors as possible.

Besides these misrepresentations, Global also used falsified references to bolster its credibility in the eyes of potential investors. Prospective buyers often asked for an independent source that could verify Global's past reputation and future prospects. Whenever this happened, salesmen were under orders from Ranney and Cioffi to refer most customers to World Petroleum Supply. Although World Petroleum occupied the same office as Global, customers were given a different address and telephone number and led to believe that the two companies were entirely independent entities. After making such a referral, the salesman would notify Global's receptionist to expect a call on World Petroleum's separate line. When the call came in, the receptionist would simply connect the customer with another Global salesman or officer, who would in turn provide a glowing report of Global's performance from the supposed-

2. The first group of contracts sold by Global held delivery dates of February 1, 1980. A second group of contracts issued later called for delivery on April 1, 1980.

3. Global attempted to make this claim credible by suggesting that the roughly $7,000 contract fee was essentially a down payment. It was not.

4. Even these more conservative estimates are doubtful. They assume that Global in fact would have been able to tender performance under the contract, a dubious assumption at best given that the company owned no oil to deliver to customers or to resell for their account. See infra text following this note.

5. Global's sister corporation, World Petroleum Supply, did purchase some futures contracts for home heating oil, but these contracts were not held for the benefit of Global customers and, in any case, were never sufficient to cover more than 60% of Global's outstanding commitments. Even assuming that they had been, investors would have been buying a futures contract on a futures contract, a far cry from the type of investment represented to them by Global Oil salesmen.

ly independent perspective of World Petroleum.

By the spring of 1980, defendants' scheme fell apart as investor losses mounted. Except for a few buyers who had complained earlier and received refunds, all of Global's customers lost their entire investments. In the meantime, Ranney, Cioffi and London had withdrawn over one-quarter million dollars from the two corporations for their own account, including payments for luxury apartments, home furnishings, loans to officers, and leases for one Rolls Royce and a Mercedes Benz.

Investor complaints led to a federal investigation. A federal grand jury was impanelled and in January 1981 returned a joint indictment against Ranney, Cioffi, London, and six salesmen on various counts of mail and wire fraud and conspiracy to commit the same. See 18 U.S.C. §§ 371, 1341, 1343 (1976). There were in addition several counts under the anti-racketeering provisions of the Organized Crime Control Act of 1970, see id. § 1962(a), and the dealer registration provisions of the Commodity Exchange Act, see 7 U.S.C. §§ 6d, 6k(1), 13(b)–(c) (1976 & Supp. IV 1980).

All nine defendants were tried together in a trial that ended in July 1981. The jury acquitted the six salesmen of all charges against them, but was unable to reach a verdict with respect to Ranney, Cioffi and London. The government then narrowed its charges against these three principals to one count of conspiracy and nine counts of mail and wire fraud. Following a second trial that ended in June 1982, a new jury returned verdicts of guilty on all counts against the three defendants. These appeals by Ranney and Cioffi followed.

## II

### A. Collateral Estoppel

 At the second trial, the district court overruled defense objections and permitted the prosecution to put on investor testimony as to the representations made to them by Global salesmen. Ranney and Cioffi contend that this testimony should have been excluded on grounds of collateral estoppel. They argue that because the jury in the first trial acquitted all six salesmen, it necessarily found that their statements did not form part of a scheme to defraud investors. In defendants' view, the government should not have been permitted to reintroduce these statements at the second trial in order to relitigate that same issue.

There is some doubt that the principle of collateral estoppel even applies to this case.[6]

---

**6.** The government argues that collateral estoppel is barred in this instance by Standefer v. United States, 447 U.S. 10, 21–25, 100 S.Ct. 1999, 2006–2008, 64 L.Ed.2d 689 (1980), which rejected nonmutual assertions of collateral estoppel in criminal cases. Defendants contend that the estoppel asserted is mutual and therefore mandated by Ashe v. Swenson, 397 U.S. 436, 443–44, 90 S.Ct. 1189, 1194, 25 L.Ed.2d 469 (1970). In civil litigation, mutuality generally hinges on both litigants having been parties to the prior action which allegedly resolved the issue in dispute. If this characterization carries over to the criminal context, then defendants clearly have the better of the argument since they along with the government were parties to the earlier trial which acquitted the codefendant salesmen.

There is some doubt, however, about the validity of the party-nonparty distinction in the criminal context for purposes of determining mutuality of estoppel. The Standefer decision appears to rest partially on the notion espoused by the Court earlier in United States v. Dotterweich, 320 U.S. 277, 279, 64 S.Ct. 134, 135,

88 L.Ed. 48 (1943), that one defendant may not derive legal benefit from the inconsistent acquittal of his fellow defendant. See Standefer, 447 U.S. at 20, 100 S.Ct. at 2006 ("[Principals] are punishable for their criminal conduct; the fate of other participants is irrelevant."). Indeed, most of the factors cited by the Standefer Court in its decision apply equally well to joint trials of criminal defendants as they do to separate trials. See id. 447 U.S. at 22–25, 100 S.Ct. at 2007–2008 (emphasizing the procedural and evidentiary limitations on the government in criminal litigation and citing the important federal interest in enforcing the criminal law). This logic suggests that a defendant's status as a "party" to an earlier joint trial in which his codefendant was acquitted may be insufficient to trigger the collateral estoppel protections mandated by the Court in Ashe v. Swenson.

Wherever the proper boundary between Standefer and Ashe may lie, however, we need not discern it today. Because the first jury most likely did not decide the issue that defendants wish to foreclose, see infra text following this note, even a ruling in their favor on the

Whether it does or not, we find that the acquittal of the salesmen at the first trial did not foreclose the issue of whether their statements to customers formed part of a scheme to defraud investors. On the contrary, the acquittals suggest that the first jury credited the salesmen's testimony that they were merely following instructions from management and that a reasonable doubt therefore existed as to their intent to participate in the crimes alleged.

This likely basis for the jury's decision clearly left open the possibility that the salesmen's statements formed part of a fraudulent scheme organized and directed by management without the culpable awareness of its sales personnel.[7] That the jury did not decide this latter issue was made clear by its failure to reach a verdict with respect to the principal defendants. Collateral estoppel would therefore be inappropriate in this instance because the jury most likely grounded its verdict on an issue

mutuality issue would ultimately prove of no benefit to them.

7. It is clear that, despite his innocence, a salesman's representations may still form part of his employer's scheme to defraud, if the employer authorized the representations and intended them to deceive prospective customers into parting with value. *United States v. Krohn,* 573 F.2d 1382, 1386 (10th Cir.), *cert. denied,* 436 U.S. 949, 98 S.Ct. 2857, 56 L.Ed.2d 792 (1978).

As an alternative ground for why the salesmen's statements should have been excluded, defendants contend that the government failed to prove the necessary element of authorization. Defendants are correct that the prosecution must show that the employer expressly or impliedly authorized or ratified a salesman's statements before those statements may be introduced as evidence against his employer. *Id.* The evidence in this case, however, is overwhelming that Ranney and Cioffi both expressly and impliedly authorized the misrepresentations that their salesmen made to prospective customers. Accordingly, the district court committed no error in permitting evidence of those misrepresentations to reach the jury.

8. The prosecutor's examination of investor witness Steven Trebaol provides a good example of this line of questioning:

Q. Would you tell us, based on [the] conversations you had with these salesmen and the review of the [sales] literature why you purchased these [contracts]?

other than the one which defendants seek to foreclose. *See Ashe v. Swenson,* 397 U.S. 436, 444, 90 S.Ct. 1189, 1194, 25 L.Ed.2d 469 (1970).

B. *Hypothetical Questions*

In the course of receiving testimony from investors about the salesmen's representations, the district court permitted the prosecution over defense objections to pose a series of hypothetical questions to each investor. These questions typically followed an investor's testimony about what had influenced him to purchase a Global Oil contract. After invariably citing one or more of the representations made to him by a Global Oil salesman as the reason for his purchase, the investor was asked whether he would have made the investment had he known that those representations were false.[8] Not surprisingly, every investor answered in the negative.

MR. CHASE: Objection.
MR. CHAMBERS: Objection.
THE COURT: He may answer.
A. The investment seemed like a reasonable one based on what Mr. Ahlberg [a Global salesman] had told me in the phone conversation and based on the information in the literature itself. The company's experienced analysts were giving this information to Mr. Ahlberg, that there was an expected price increase that apparently was going to be soon, since I had to act quickly, and that, well, the sooner I did act the better the purchase price. To avoid the price increase and get a lower purchase price. And also Mr. Ahlberg would be relying on the company's analyst to determine exactly at what point in March the price increase was peaking and that I could make the maximum profit.

Q. Now, Mr. Trebaol, would you have purchased this contract if you were told the company never had a physical supply of oil?
MR. CHASE: Objection.
MR. CHAMBERS: Objection.
THE COURT: He may answer.
A. No.
Q. Would you have purchased this if you were told the company never paid any money for the purchase, delivery and storage of this oil?
MR. CHASE: Objection.
MR. CHAMBERS: Objection.
THE COURT: Overruled.
A. No.
Transcript at 10–94 to 10–96.

Defendants contend that the danger of unfair prejudice inherent in these hypothetical questions substantially outweighed their probative value, and that the district court therefore erred in failing to exclude them under rule 403 of the Federal Rules of Evidence.[9] The thrust of defendants' attack is that the answers elicited by these inquiries were: (1) inherently speculative because the witness had never confronted the situation posed in the question, and (2) probably biased owing to the witness's animus toward his perceived victimizer.

Initially, we note that our review is limited to discerning whether the district court abused its discretion in admitting the challenged questions. Rule 403 does not mandate exclusion but merely permits it if the factors cited in the rule substantially weigh in that direction. **Fed.R.Evid.** 403 ("evidence *may* be excluded if ..." (emphasis added)). Because the district court can more easily assess the dangers and probative value associated with proffered evidence, admissibility under rule 403 is best left to the sound discretion of the trial judge. *See generally* 2 **D. Louisell & C. Mueller, Federal Evidence** § 125 (1978). As an appellate court, we will interpose our judgment only if the complaining party can demonstrate that the district court's ruling did not fall within the ambit of reasonable debate.

■ The testimony in this instance clearly went to show that investors relied on Global's fraudulent sales representations, and that but for those representations no witness would have purchased an oil contract from the company. Although the government need not prove victim reliance to make out a case of mail or wire fraud, such evidence does tend to show the existence of a scheme to defraud and the deceptive nature of defendants' solicitations. *Phillips v. United States,* 356 F.2d 297, 308–

09 (9th Cir.1965), *cert. denied,* 384 U.S. 952, 86 S.Ct. 1573, 16 L.Ed.2d 548 (1966). The investors' testimony in response to the hypothetical questions was therefore relevant to the government's case and presumptively admissible under rule 402 of the Federal Rules of Evidence.

■ Defendants rely on rule 403, however, which does permit the presumption favoring admission of relevant evidence to be overcome in certain circumstances. To prevail on this issue, they must show not only that the danger of unfair prejudice posed by the evidence substantially outweighed its probative value, but also that the district court abused its discretion in striking the balance in favor of admission. We are satisfied that defendants have carried neither of these burdens.

Besides general allegations that the investor responses tended to inculpate them in the jury's eyes, defendants make no specific charges of unfair prejudice, such as the evidence's tendency to suggest conviction on an improper basis or its potential for misuse by the jury. *See* **Fed.R.Evid.** 403 advisory committee note; 2 **D. Louisell & C. Mueller, Federal Evidence** § 126 (1978). That certain evidence tends to incriminate a defendant is insufficient to establish *unfair* prejudice under rule 403. After all, the entire purpose for introducing evidence at a criminal trial is to establish the defendant's guilt or innocence.

Nor was the investors' testimony lacking in probative value. Defendants assert that the responses elicited by the prosecution's hypothetical questions were likely to be merely speculative or vindictive for the reasons outlined earlier. Yet there was unrefuted evidence in the case that other investors had actually terminated their investments after discovering the truth about defendants' scheme in time to demand a re-

---

**9.** *Defendants also contend that the hypothetical questions were impermissibly leading under Federal Rule of Evidence 611(c). Rarely, however, will an appellate court interfere with the trial judge's broad discretion to control the mode and order of interrogation under subsection (c) of the rule.* **Fed.R.Evid.** 611(c) adviso-

ry committee note. *Defendants present no reason why we should deviate from this sound practice in the present case, and we accordingly decline their invitation to second-guess the trial court's exercise of its discretion in this instance.*

fund. This evidence suggested that investor testimony that no investment would have been made absent the misrepresentations would not be merely speculative or vindictive; on the contrary, past events tended to credit such responses as entirely believable and accurate.

For these reasons, defendants have clearly failed to demonstrate that the danger of unfair prejudice inherent in the investor responses substantially outweighed their probative value. Indeed, defendants have shown no unfair prejudice or diminished probative value at all. Under these circumstances, we are loath to find that the district court abused its discretion in admitting the challenged testimony. On the contrary, the circumstances of this case [10] suggest that the district court's implicit balancing of the factors spelled out in rule 403 was not merely defensible but eminently correct.[11]

## C. Brady *Violations*

■ Midway through the second trial, the government turned over to the defense the grand jury testimony of two former Global salesmen, Grant Johnson and David McGilvray. Although it took the position that the testimony did not constitute *Brady* material, *see Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), the government voluntarily surrendered the transcripts so that defense counsel could

**10.** Defendants cite four cases in which courts have excluded hypothetical questions because of doubts about the probative value of the responses the questions might have elicited. Two of the cases are simply inapposite because they did not involve hypothetical questions. *Boomer v. New York Cent. R.R.,* 409 F.2d 382, 385 (7th Cir.1969); *Cohen v. Public Hous. Admin.,* 257 F.2d 73, 77 (5th Cir.1958), *overruled in United States v. Jefferson County Bd. of Educ.,* 380 F.2d 385, 389 & n. 3 (5th Cir.1967). The remaining two cases involved situations in which the witness was required to give far more than a simple "yes" or "no" answer, *see Elyria-Lorain Broadcasting Co. v. Lorain Journal Co.,* 298 F.2d 356, 357, 360 (6th Cir.1961) (witnesses in antitrust case asked to estimate how much they would have invested in advertising on plaintiff's radio station had defendant's monopolistic policies not been in effect; questions barred as too speculative for proving amount of damages with certainty), or in which substantial grounds existed for doubting the reliability of a negative answer, *see Bridgen v. Scott,* 456 F.Supp. 1048, 1063–64 (S.D.Tex. 1978) (plaintiff investors in real estate limited partnership testified that they would not have invested had they known more details about the underlying property transaction; testimony barred as self-serving and unreliable owing to the enormous tax benefits actually realized by the investors through the partnership). *See also Roberts v. Sears, Roebuck & Co.,* 531 F.Supp. 784, 787–88 & n. 5 (N.D.Ill.1982).

Far more on point are the two cases cited by the government in which hypothetical questions were permitted in criminal prosecutions for mail fraud. *See United States v. Bush,* 522 F.2d 641, 649–51 (7th Cir.1975) (city aldermen asked whether they would have awarded contract to company had they known of defendant public officer's concealed interest in the company), *cert. denied,* 424 U.S. 977, 96 S.Ct. 1484,

47 L.Ed.2d 748 (1976); *United States v. Isaacs,* 493 F.2d 1124, 1162 (7th Cir.) (members of state commission asked whether they would have granted racing dates to two corporations had they known of defendant governor's concealed interest in the companies), *cert. denied,* 417 U.S. 976, 94 S.Ct. 3183, 41 L.Ed.2d 1146 (1974). Just as in the present case, there were no unusual circumstances in either *Bush* or *Isaacs* that cast doubt on the probity of potential witness responses to the hypothetical questions posed.

Taken together, the two relevant cases cited by defendants and those cited by the prosecution stand for the principle that decisions about admissibility in rule 403 situations are best left to the sound discretion of the trial judge. In *Elyria-Lorain Broadcasting, Bush,* and *Isaacs,* the reviewing appellate courts simply affirmed district court rulings either excluding or admitting challenged testimony. *Bridgen* itself was a district court opinion.

**11.** Our holding on this issue in no way casts doubt on traditional hypothetical question doctrine. That doctrine bars lay witnesses from drawing conclusions from factual premises about which they have no personal knowledge; only expert witnesses may so testify. *See generally* 2 **J. Wigmore, Evidence** §§ 672–686 (J. Chadbourn rev. 1979). The principles underlying the doctrine are embodied in the current Federal Rules of Evidence. *See* **Fed.R.Evid.** 602 (personal knowledge requirement), 701 (opinion testimony by lay witnesses), 703 (opinion testimony by expert witnesses). Although the questions posed in this case asked witnesses to hypothesize that no misrepresentations had been made to them, they were still testifying from their personal knowledge about the value of the investment opportunity offered by defendants.

make its own determination. After reviewing the transcripts, counsel for all three defendants moved for a mistrial on the basis that the salesmen's statements were exculpatory and that, had the prosecution surrendered them before the first trial, the first jury might have returned a verdict of acquittal. After its own careful review of the grand jury testimony, the district court concluded that the transcripts were not *Brady* material, and accordingly denied defendants' motions.

Defendant Cioffi appeals this ruling, asserting that two bits of testimony contained in the transcripts are exculpatory with respect to him. The first bit is Johnson's statement that another salesman had told him that Cioffi was a mere "figurehead." Cioffi contends that this testimony tends to cast doubt on his knowing participation in the fraudulent scheme. The second bit is McGilvray's statement that Cioffi had expressed a belief that the winter weather would turn colder and cause oil prices to rise. Cioffi asserts that this testimony lends credence to his story that he genuinely believed oil prices would increase and that he therefore never intended to deceive Global Oil customers.

Under *Brady*, the prosecution has a duty under the due process clause to turn over evidence favorable to the accused upon his request.[12] *See* 373 U.S. at 87–88, 83 S.Ct. at 1196–1197. The only requirement is that the evidence be material in the sense that it could have affected the outcome of the trial. *United States v. Agurs*, 427 U.S. 97, 104, 96 S.Ct. 2392, 2397, 49 L.Ed.2d 342 (1976). The Johnson "figurehead" statement clearly is inadmissible hearsay because he was merely relating what another salesman had told him about Cioffi. Inadmissible evidence is by definition not material, because it never would have reached the jury and therefore could not have affected the trial outcome. *Id.* at 105–06, 96 S.Ct. at 2398–99.

 Likewise, defense counsel's own conduct at the second trial establishes the immateriality of McGilvray's "cold weather" testimony. The prosecution turned over the transcripts when it rested its case, and defense counsel thoroughly reviewed them in preparing its motion for mistrial. Yet one week later with McGilvray on the stand as a defense witness, Cioffi's counsel never even broached the subject of McGilvray's "cold weather" testimony before the grand jury. We are confident that, had this testimony been material, counsel would not have failed to note it and bring it to the second jury's attention. Because neither statement cited by Cioffi meets the standard of materiality necessary to make out a *Brady* violation, we affirm the district court's ruling against him on this issue.

### D. *Prejudicial Closing Remarks*

 In his closing statement, the prosecutor compared the defense to a slick sales operation like that carried out by Global Oil, and warned the jurors not to be taken in by the defenses' protestations of innocence. On appeal, Ranney and Cioffi contend that these remarks irreparably prejudiced them in the eyes of the jury. They ask us to reverse their convictions on this ground.

We decline that request. Even were we to view the prosecutor's metaphor as anything more than mere rhetorical excess, the prejudicial effect of his comments would appear inconsequential in comparison to the overwhelming evidence of guilt. Any error introduced by his remarks was therefore harmless. *United States v. Rhoden*, 453 F.2d 598 (5th Cir.), *cert. denied*, 406 U.S. 947, 92 S.Ct. 2050, 32 L.Ed.2d 334 (1972).

*Affirmed.*

---

12. We are willing to assume for purposes of argument that Cioffi made a specific request for *Brady* material, thereby triggering the more easily satisfied standard of materiality applicable to such cases. *See United States v. Agurs*, 427 U.S. 97, 103–14, 96 S.Ct. 2392, 2397–02, 49 L.Ed.2d 342 (1976).