**Walter J. THOMAS, Appellant**

v.

**DISTRICT OF COLUMBIA, Appellee.**

No. 06–CV–260.

District of Columbia Court of Appeals.

Argued Sept. 19, 2007.

Decided Feb. 28, 2008.

---

Donald L. McClure, Sr., for appellant.

Edward E. Schwab, Deputy Solicitor General at the time the brief was filed, with whom Eugene A. Adams, Interim Attorney General for the District of Columbia at the time the brief was filed, and Todd S. Kim, Solicitor General, were on the brief, for appellee.

Before RUIZ, BLACKBURNE–RIGSBY, and THOMPSON, Associate Judges.

THOMPSON, Associate Judge:

Appellant Walter Thomas seeks reversal of a trial court order granting summary judgment to appellee District of Columbia on several counts of a lawsuit in which Thomas sought to recover damages for injuries allegedly caused by the District's delay in disbursing Thomas's retirement funds. Thomas also appeals the trial court's entry of a directed verdict on the one count of his lawsuit that the court allowed to proceed to trial, in which Thomas asserted that the lump-sum retirement payments that he received were less than the total amount to which he was entitled (Thomas's "underpayment claim"). We affirm.

## I.

Thomas, who had previously worked for District of Columbia agencies during the period from 1989 to 1995, was hired again by the District in 1998. Erroneously, he was coded as an employee eligible for benefits under the Civil Service Retirement System (CSRS)[1] rather than under the District's Defined Contribution Plan—a coding error similar to one that had occurred during Thomas' earlier periods of employment with the District. Thomas was terminated from his most recent employment with the District on March 28, 2003, after his position was abolished. Thereafter, on July 19, 2003, he was injured in a car accident in which he sustained an injury to his lumbar spine.

On February 10, 2004, Thomas requested a lump-sum payout of his retirement benefits. Only then was the error in coding discovered and corrected, causing a delay in the District's processing of Thomas' request and a concomitant delay in disbursement of the requested funds. On April 17, 2004, Thomas filed suit against the District and two employees of the Office of Pay and Retirement[2] (together, the "District defendants"), claiming, *inter alia,* negligence, breach of implied contract, and violations of District of Columbia statutory provisions governing the District's Defined Contribution Plan,[3] and alleging a failure by the District defendants to competently and timely process his retirement benefits. The same day, Thomas moved for temporary injunctive relief directing the District to make the delayed payment. He asserted that the payment delay left him without funds to purchase the expensive medications that he needs because of his seri-

---

1. Employees are eligible for CSRS only if they were hired on or before September 30, 1987. See D.C.Code § 1–626.04(3) (2001).

2. The employees were Judy Banks, Director of that office, and Johnetta Bond, Deputy Director. Thomas did not name them as appellees in his Notice of Appeal or in the certificate he submitted pursuant to D.C.App. R. 28(a)(2) (requiring a list of "all parties ... in the appellate proceeding"). We therefore assume that Thomas does not challenge the portion of the summary judgment order that dismissed his claims against Banks and Bond. In any event, we discern no error in the trial court's findings that because "neither Ms. Banks nor Ms. Bond was ever served as an individual, ... the court [could] not exercise personal jurisdiction over them other than as

employees of the District of Columbia acting within the scope of their employment," and that a "suit against them in their official capacities ... is in reality a suit against the District of Columbia." November 17, 2005 Order at 3 (citing *Kentucky v. Graham,* 473 U.S. 159, 165–66, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985)).

3. D.C.Code § 1–626.05 (2001) provides, in pertinent part, that "[t]he retirement benefits program of the District shall consist of ... [a] defined contribution plan pursuant to § 401(a) of the Internal Revenue Code [26 U.S.C.S. § 401]." D.C.Code § 1–626.11(a) (2001) directs that the funds contributed by the District under the defined contribution plan are to be placed into "an irrevocable trust called the Section 401(a) Trust."

ous spinal cord injury. He alleges that his financial inability to purchase his prescribed medications resulted in an aggravation of his injury.[4] The District paid Thomas $11,286.06 on May 13, 2004, and the trial court denied the temporary injunction motion as moot.

Thomas acknowledges that the District paid him an additional $5,338.89 on June 4, 2004. But he claims that he is owed additional amounts, both with respect to a draw-down of retirement funds that he requested in 1995 (based on his service from 1989 to 1995) and with respect to the 2004 draw-down (attributable to his service from 1998 to 2003). More particularly, he asserts that the total amount of retirement funds that the District has paid to him falls short of (i) the total amount that the District should have contributed to the Defined Contribution Plan on his behalf for his service over the period from 1989 to 2003, plus (ii) the interest that would have been earned on those contributions. He asserts in his brief to this court that the total due him "would have been approximately $44,000.00 had the issue been submitted to the Jury for computation."[5]

Following a pre-trial conference held on June 7, 2005, the trial court issued a pre-trial order directing the District defendants to file an omnibus pre-trial brief on all issues by August 1, 2005, and requiring Thomas to file his opposition brief by September 15, 2005. In his opposition brief, filed on September 14, 2005, Thomas explained that although the District defendants had "ignored" the issue of the "clear statutory law empowering the Plaintiff to bring tort-style claims against the Defen-

dants for Violation of the Retirement and benefits rights owed to District of Columbia employees by said employees," his brief would "address[ ] same to assist the Trial Court's decision-making on this point." Thomas then argued that his suit was specifically authorized by D.C. Code § 1–626.14, which states, in relevant part, that:

> A civil action may be brought by a participant or a beneficiary of the Trust, or by the District, to enjoin any act or practice that violates any provision of this chapter or the terms of the retirement program, and for other appropriate legal and equitable relief.

D.C.Code § 1–626.14 (2001).

On November 17, 2005, the court issued an order granting summary judgment to defendants/appellees on Thomas's claims for damages for aggravation of his back injury and for other consequential damages. The court cited its "right and duty to grant summary judgment *sua sponte* when it appears that a party cannot prevail on a claim or defense as a matter of law so long as the losing party was on notice that it had to come forward with all of its evidence." The court noted the absence of any case law "allow[ing] these types of damages on a claim of this kind," *id.* at 4, and reasoned that regardless of whether Thomas sought recovery on a tort or contract theory, the damages he alleged were not reasonably foreseeable. The court also found that the evidence would "not support a reasonable finding" that defendants' conduct was the proximate cause of Thomas's back injury.

---

4. Thomas states that he was unable to purchase Naproxen and Soma, whose purposes were "to keep an adequate flow of blood to the lumbar spine area to keep the muscle tissue from [atrophying]." His complaint seeks damages for aggravation of his physical injury and for "physical and mental anguish."

5. The trial court's summary judgment order states that Thomas "claims he is still owed approximately $11,000." November 17, 2005 Order at 5 n. 2.

The court permitted trial to go forward on Thomas's underpayment claim, reserving until trial the issue of whether Thomas needed an expert to prove his claim.[6] Trial commenced on February 27, 2006. On February 28, 2006, at the close of Thomas's case, the court granted the District's oral motion for judgment as a matter of law. The trial judge explained (in her order declining to "order that a [trial] transcript be prepared at government expense"[7]) that she "directed a verdict against plaintiff for failing to present expert evidence in a complex financial matter involving more than simple mathematics." This appeal followed.

## II.

"We conduct an independent review of whether a summary judgment motion was improperly granted, and apply the same standard as the trial judge." *Bailey v. District of Columbia*, 668 A.2d 817, 819 (D.C.1995). "If, viewing the record in the light most favorable to the non-moving party, we conclude that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law, the judgment of the trial court will be affirmed." *Hospitality Temps Corp. v. District of Columbia*, 926 A.2d 131, 134 (D.C.2007). A court may grant summary judgment *sua sponte* when it appears that a party cannot prevail on a claim or defense as a matter of law, so long as the losing party was on notice that it had to come forward with all of its evidence. *See*

*Tobin v. John Grotta Co.*, 886 A.2d 87, 89–90 (D.C.2005).

We review a trial court's determination that expert testimony was needed for abuse of discretion. *See Waggaman v. Forstmann*, 217 A.2d 310, 312 (D.C.1966); *see also Cranston Print Works Co. v. Public Service Co.*, 291 F.2d 638, 645 (4th Cir.1961) ("in the exercise of [its] discretion, the [trial] court must ... determine whether the subject matter of the suit is such that the issues cannot be properly understood or determined without the aid of opinions of persons of special knowledge or experience ....") (quoting *Gilbert v. Gulf Oil Corporation*, 175 F.2d 705, 709 (4th Cir.1949)).

## III.

Thomas argues that the trial court erred in granting summary judgment because the court did not give him "notice ... that [he] was to come forth with all of [his] evidence, or that the Trial Court intended to grant the motion for summary judgment sua esponte [sic]." We reject this argument. As noted above, in his brief responding to the District's omnibus trial brief, Thomas stated explicitly that he intended to assist the court by explaining what he contended (and still contends) is the statutory authority for his damages suit. Thus, even if Thomas did not understand or envision that the court might consider whether to grant summary judgment *sua sponte*, it seems clear that he was not prejudiced by any lack of notice.[8]

---

6. The court also reserved until trial the issue of whether Thomas's claim that he was underpaid in 1995 was barred by the applicable statute of limitations.

7. *See Hancock v. Mutual of Omaha Ins. Co.*, 472 A.2d 867, 871 (D.C.1984) (holding that "the losing civil litigant who [like appellant here] proceeds in forma pauperis has the burden of convincing the trial court that a sub-

stantial question exists on appeal in order to get a free transcript").

8. We reach this conclusion without relying on the trial court's recollection, described in the summary judgment order, that at the pre-trial conference the court extensively discussed its "reservations about the viability of Plaintiff's legal theories" and ordered the parties "to brief the issues and to identify whatever evi-

Moreover, as we explain *infra* and as the trial court recognized, Thomas's damages claims fail "not for lack of evidence, but lack of law." Order at 2 n. 1.

Thomas relies on D.C.Code § 1–626.14 (2001), which authorizes civil actions for "appropriate legal and equitable relief" from "any act or practice that violates any provision of ... [the District's] retirement program." But he fails to take into account 6 DCMR § 2607.3, one of the regulations promulgated to implement the statutorily-mandated Defined Contribution Plan (the "Plan"). Section 2607.3 provides that:

> The liability of the Plan to any participant, former participant, or beneficiary with respect to the distribution of benefits shall be limited to his or her active or inactive account balance, as the case may be, as recorded on the books of the Administrator on the date of separation from service, disability, or death, and shall include any income earned thereafter.

Section 2607.3 was adopted pursuant to D.C.Code § 1–626.08(b) (directing the Mayor to issue rules to implement the provisions of the District retirement program, subject to review by the District of Columbia Council). It was published in the District of Columbia Register and approved by the Council of the District of Columbia ("the Council"), *see* 37 D.C.Reg. 954, 961 (Feb. 2, 1990), and therefore has the force of law. *See J.C. & Assocs. v. District of Columbia Bd. of Appeals & Review,* 778 A.2d 296, 303 (D.C.2001) ("A validly promulgated regulation generally has the force of law").

Thus, section 2607.3 establishes as a matter of law that the Defined Contribution Plan's liability to beneficiaries is limited to Plan contributions and earnings. Stated differently, section 2607.3 represents an interpretation by the D.C. Office of Personnel, accepted by the Council, that the civil actions authorized by D.C.Code § 1–626.14 do not include suits to recover damages for personal injury or other consequential damages. We therefore must agree with the trial court that "the personal injury for which [Thomas] is seeking compensation is not the type of 'appropriate legal relief' the District of Columbia Council had in mind" in enacting D.C.Code § 1–626.14. November 17, 2005 Order at 7 n. 4.[9] Accordingly, we hold, the trial court did not err in granting summary judgment to the District on Thomas's damages claims.[10]

dence was in the record to support or refute Plaintiff's various claims." Order at 2 n. 1. We therefore need not address Thomas's argument that, before ruling, the trial court (and we) should have "settle[d] the record" by determining precisely what was said at the pre-trial conference.

**9.** Notably, the limitation on liability described in section 2607.3 is not merely a bar against a beneficiary's damages claim against the Section 401(a) Trust into which the District is required to deposit Defined Contribution Plan contributions. Rather, the regulation limits the liability of "the Plan," *i.e.,* the "District of Columbia Defined Contribution Pension Plan," 6 DCMR § 2601.1, the plan "whereby the District, as the employer, shall contribute to a trust ... a designated amount equal to

not less than seven percent (7%) of the base salary of each employee who is a participant in the Plan." 6 DCMR § 2601.2. We hold that in limiting the liability of "the Plan," section 2607.3 limits the liability of the District of Columbia itself as employer (or, as in Thomas's case, former employer).

**10.** Section 2607.3 limits the District's liability to a beneficiary's "account balance ... as recorded on the books of the Administrator on the date of separation from service" and any income earned thereafter. Because the District's contributions on Thomas's behalf had been misdirected to CSRS and were not recorded on the books of the Defined Contribution Plan Administrator as of the date of termination of Thomas's employment, section 2607.3 does not precisely address his situa-

## IV.

We consider next Thomas's claim that the trial court erred in directing a verdict for the District on his claim that the District underpaid the retirement benefits due to him. A verdict may be directed only if it is clear that the plaintiff has not established a *prima facie* case. *See Haynesworth v. D.H. Stevens Co.*, 645 A.2d 1095, 1097 (D.C.1994). "A directed verdict is appropriate only if, when the evidence is viewed in the light most favorable to the opposing party, there is no legally sufficient evidentiary basis for a reasonable jury to find for the nonmoving party." *Snyder v. George Wash. Univ.*, 890 A.2d 237, 243–44 (D.C.2006).

Thomas contends that he did establish a *prima facie* case of underpayment that made a directed verdict for the District improper. He asserts that, at trial, he presented exhibits that "provided an accounting of [his] work history, salary, position title, pension eligibility, and break in service," data that he argues were "sufficient for the Jury to compute [the required] Contributions[,] which were 7% of his Salary." He asserts that the District stipulated that the "only Trust Fund that District of Columbia Employees had available for investment purposes at that time was the GIA Fund," and that the court admitted into evidence a document showing the performance history of that fund from March 6, 1989 through March 28, 2003. He argues that the "[j]ury now had all of the data needed to compute Plaintiff's total contributions compounded with interest (Fund performance) over the cited period," and could do simple arithmetic to determine how much more was due to him beyond the amount that the District paid.

We agree with the trial court that the entire matter is more complex than Thomas represents. Thomas's brief reveals his assumption that simply by knowing the annual amounts that the District should have deposited into the Defined Contribution Plan Trust and inflating those amounts (with appropriate compounding) by "Fund performance," the jury could determine the total amount that the District was required to pay him. That assumption overlooks a number of complexities, such as the impact of the timing of the District's contributions to the Trust, *i.e.*, the impact (on earnings) of the fact that the District makes contributions in installments,[11] rather than annually in one lump sum,[12] and the concurrent impact of fluctuating rates of return from quarter to quarter. Much more information than Thomas presented during his case-in-chief at trial—such as expert testimony about

---

tion. Nevertheless, we think the Council's approval of section 2607.3 evinces beyond peradventure that, in enacting D.C.Code § 1–626.14, the Council did not intend to provide a damages remedy such as Thomas seeks. We think section 2607.3 provides answers to two questions that must be asked when the issue is whether the Council intended to create a particular cause of action: "is there any indication of legislative intent, explicit or implicit, either to create such a remedy or to deny one?" (the answer is that section 2607.3 indicates a legislative intent to deny a damages remedy); and "is it consistent with the underlying purposes of the legislative scheme to imply such a remedy for the plaintiff?" (the answer is "no"). *Coates v. Elzie*, 768 A.2d 997, 1001 (D.C.2001), quoting *Cort v. Ash*, 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975).

**11.** By law, contributions are to be made "not less frequently than quarterly." D.C.Code § 1–626.09(c).

**12.** *See Board of Admin. v. Wilson*, 52 Cal. App.4th 1109, 1140, 61 Cal.Rptr.2d 207 (Cal. Ct.App.1997) (quoting an expert's testimony about the importance of timing of plan contributions and the expert's observation that "[w]hen monies are contributed later than expected, reduced earnings result").

what overall "Fund performance" represents and about the relationship between "Fund performance" and individual-investor returns—was needed to establish that the District paid Thomas less than he was entitled to receive as earnings on the Defined Contribution Plan contributions that the District was obligated to make on Thomas's behalf.[13] Thomas does not deny that he failed to present expert testimony at trial.[14] He also has provided this court with no explanation about how the District calculated the investment "earnings" payable to him, leaving us utterly without any basis to conclude that, by the end of his case-in-chief, he had established a *prima facie* case of underpayment.

■ Thomas's brief and trial exhibits reveal that the issue of contribution earnings was only one of the issues involved in Thomas's underpayment claim. The other issue was the total amount that the District was required to contribute to the 401(a) Trust on Thomas's behalf. The tri-

al exhibits show that Thomas presented evidence about his salary levels over the years involved, about (what Thomas argues were) the required contribution amounts based (at least roughly) on a 7%-of-salary formula, and about the contribution amounts and interest that the District paid over to him.[15] We can agree that it would have been a matter of simple arithmetic for the jury to calculate a total "required" contribution amount using the formula that Thomas presented, and to contrast that amount to the amount that the District actually paid Thomas. And, that might have been enough to entitle Thomas to get to the jury on his underpayment claim were it not for the fact that, with respect to the 1998–2003 time period for which the Thomas claims that the District's contribution amount was insufficient, Thomas's 7%-of-salary formula is legally erroneous.[16]

Prior to October 1, 1996, the statute governing District retirement benefits pro-

13. We have not overlooked the argument that Thomas presented in his opposition to the District's motion for summary judgment, *i.e.,* that his earnings claim is based on his estimate of a "reasonable" rate of return rather than on the (higher) ten-year "Fund performance" figure shown on Fund documents. In our judgment, this approach is not a sufficient substitute for expert testimony about what the earnings would likely have been on Thomas's account if the District had timely made 401(a) contributions on his behalf. It was not an abuse of discretion for the trial judge to determine that "expert evidence" was needed in this "complex financial matter."

14. Thomas argues, however, that he was "entitled to present his opinion as to the amount of earnings he was entitled to," citing *United States v. Ranney,* 719 F.2d 1183 (1st Cir. 1983). His reliance on *Ranney* is misplaced. The court in that case cited the general rule of evidence that one may not ask or pose a hypothetical question to a lay witness and ask the witness to draw conclusions from a factual premise about which the witness has no personal knowledge, noting that "only expert

witnesses may so testify." *Id.* at 1187. The court nonetheless allowed lay investors to testify that they would not have made certain investments if they had known certain facts that the defendants withheld from them. The court reasoned that "[a]lthough the questions posed in this case asked witnesses to hypothesize that no misrepresentations had been made to them, they were still testifying from their personal knowledge about the value [as they understood it] of the investment opportunity offered by defendants." *Id.* at 1189. The case provides no support for Thomas's argument that he needed no expert to testify about the amounts that would have been earned on the contributions that the District was to make to the 401(a) Trust on his behalf.

15. Thomas asserts in his Reply Brief that we can rule on the basis of the "Trial Exhibits without any other extensive Trial Transcript." We agree.

16. With regard to the 1989–1995 period, Thomas appears to dispute only the earnings amount.

vided that the District "shall contribute an amount equal to not less than 7% of the base salary of each employee participating in the defined contribution plan...." D.C.Code § 1-627.9(c) (1991 Supp.). Effective October 1, 1996, the statute was amended to provide that the District "shall contribute an amount equal to not less than 5% of the base salary of each employee participating in the defined contribution plan...." D.C.Code § 1-626.09(c) (2001).[17] The amendment was enacted as part of D.C. Law 11-198, the "Fiscal Year 1997 Budget Support Act of 1996," the stated purpose of which, according to the June 19, 1996 Report of the Council Committee of the Whole ("the Committee Report"), was to incorporate "measures [that] will result in substantial savings to the District government as well as generate revenue and cash for the District government, as part of a comprehensive effort to balance the District's general fund operating budget and to alleviate cash shortfalls." Thus, the purpose of 1996 amendment to the statutory "Contributions" provision now codified at D.C.Code § 1-626.09(c) was to reduce District expenditures by relieving the District of its previous statutory burden of making Defined Contribution Plan contributions of at least 7% of base salary on behalf of District employees.[18]

Although the governing statute was amended as described, the regulation that had been promulgated in 1990[19] to implement the Defined Contribution Plan, 6 DCMR § 2605.2, has not been amended, and continues to state that ("in no event

shall the amount [contributed by the District to the Defined Contribution Plan on behalf of an eligible employee] be less than seven percent (7%) of the base salary of each participant"). However, according to an explanation that the District provided to Thomas by letter dated May 25, 2004 (a letter admitted into evidence as one of Thomas's trial exhibits), the District's contribution level for the 1998-2003 period in dispute here was 5%, not 7%. The letter states that "[t]he employing agency currently contributes 5% (7% prior to 10/1/96) of employees' annual salary to the fund...."

 For the District actually to have contributed at the 7% level that Thomas assumes was required would not have conflicted with the letter of D.C.Code § 1-626.09(c), because 7% is "not less than 5%." D.C.Code § 1-626.09(c). But Thomas's argument that the District was *required* to contribute at the 7% level is untenable in light of D.C. Law 11-198 and its purpose. As we have observed, the legislative purpose behind adoption of the "not less than 5%" language of D.C.Code § 1-626.09(c) was to ease the District's retirement plan contribution burden. In the face of that statutory change, the holdover regulation that purports to impose a greater (*i.e.,* 7%) burden cannot be given effect. We therefore conclude, as a matter of law, that Thomas's evidence about the amounts that should have been contributed to the Defined Contribution Plan on his behalf—which reflects an assumption that 7% was the required contribution level—could not provide a basis to prove his claim of underpayment.[20]

17. *See* 43 D.C.Reg. 4573, 4583 (Aug. 23, 1996).

18. The Committee Report explains that "[s]ubsection (b) [of the bill that became D.C. Law 11-198] amends [the statute] to reduce the District's contribution from 7% to 5% to the defined contribution plan for employees

hired after September 30, 1987." Committee Report at 4.

19. *See* 37 D.C.Reg. 954, 958 (Feb. 2, 1990).

20. Thomas's Notice of Appeal challenged in addition the trial court's May 17, 2005 denial of Thomas's motion that asked the motions

For all the foregoing reasons, we conclude that the trial court did not err in entering judgment in favor of the District.

*Affirmed.*

judge to recuse himself for bias. Thomas contended in his motion that the court's bias was evident from a statement, contained in the judge's December 20, 2004 order denying Thomas's motion for summary judgment, that granting judgment against the District for its inadvertent failure to respond to Thomas's Request for Admissions could permit Thomas to reap a "windfall." Thomas now contends that the judge's bias was also evident from a statement, contained in the court's November 17, 2005 order granting summary judgment to the District, that it could not have been reasonably foreseeable that a long-time District employee such as Thomas would be "penniless." We discern no evidence of bias in these statements that the court made to explain its rulings. We note, moreover, that "to be disqualifying, alleged bias and prejudice must stem from an extrajudicial source and result in an opinion on the merits on some basis other than what the judge learned from his participation in the case.'" *United States v. Grinnell Corporation*, 384 U.S. 563, 583, 86 S.Ct. 1698, 16 L.Ed.2d 778 (1966); *see also In re Banks*, 805 A.2d 990, 1003 (D.C.2002) ("[J]udicial rulings alone almost never constitute a valid basis for a bias or partiality motion"). The statements that Thomas cites as evidence of bias reflect no more than judicial determinations "derived from evidence and ... proceedings had before the court," *In re Bell*, 373 A.2d 232, 233 (D.C.1977), and were not disqualifying.